UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bernell Antwon Grant,

Plaintiff,

v.

Darryl Quiram, M.D.;[1] Gene Kliber,
P.A.; Robin Ouellette, R.N.; and
Centurion of Minnesota,

Defendants.

Civ. No. 14-4589 (WMW/BRT)

**REPORT AND
RECOMMENDATION**

Bernell Antwon Grant, 212 Rosewood Lane #23, Cartersville, GA 30120, *pro se* Plaintiff.

Anthony J. Novak, Esq., and Mark A. Solheim, Esq., Larson King LLP, counsel for Defendants Quiram, Kliber, and Centurion of Minnesota.

Margaret E. Jacot, Esq., Minnesota Attorney General's Office, counsel for Defendant Ouellette.

BECKY R. THORSON, United States Magistrate Judge.

While incarcerated at the Minnesota Correctional Facility at Faribault, Bernell Antwon Grant fractured his right fourth metacarpal (*i.e.*, the bone connecting his wrist to his ring finger) during a fight with a fellow inmate. In this civil rights action under 42 U.S.C. § 1983, Grant asserts Eighth Amendment claims against the prison medical personnel who tended to his injury, Nurse Robin Ouellette, Dr. Darryl Quiram, and Physician Assistant Gene Kliber, alleging that they acted with deliberate indifference to

---

[1]   Dr. Darryl Quiram's surname is misspelled in Grant's pleadings as "Quirram."

his medical needs when they failed to send him to an outside emergency room immediately following his injury. (Doc. No. 8, Second Am. Compl. ¶¶ 2–4, 32–35.) He claims that P.A. Kliber also acted with deliberate indifference by lowering his pain medication and failing to schedule a timely follow-up appointment with his outside orthopedic specialist. (*Id.* ¶¶ 3, 34.) And he seeks to hold the Department of Corrections' contract medical provider, Centurion of Minnesota, liable for the alleged constitutional violations because it employs Dr. Quiram and P.A. Kliber (collectively "Centurion Defendants"). (*Id.* ¶ 36.)

The Centurion Defendants and Nurse Ouellette have separately moved for summary judgment on Grant's Eighth Amendment claims, principally on the ground that they did not deliberately disregard his medical needs, but rather, provided reasonable and appropriate care in the exercise of their professional medical opinions. (Doc. No. 32, Def. Ouellette's Mot. for Summ. J.; Doc. No. 33, Ouellette's Mem. 1–2, 6–10; Doc. No. 39, Centurion Defs.' Mot. for Summ. J.; Doc. No. 40, Centurion Defs.' Mem. 2, 4–6.) For the reasons stated below, this Court agrees that the evidence, even when viewed in the light most favorable to Grant, fails to support a reasonable inference that the defendants acted with deliberate indifference to his medical needs. Accordingly, this Court recommends that the defendants' motions for summary judgment be granted.

### I. BACKGROUND

On the night of July 2, 2014, around 10:00 p.m., Grant injured his right hand while punching a fellow inmate at the Minnesota Correctional Facility at Faribault ("MCF-Faribault"). (*See* Doc. No. 35, Aff. of Dr. David Paulson ¶ 11 & Ex. D at 1; Doc. No. 36,

Aff. of Robin Ouellette ¶¶ 5–6; Doc. No. 42, Aff. of Anthony Novak, Ex. I, Defs.' Interrogs. ¶ 1.) Nurse Robin Ouellette promptly tended to Grant's hand and examined it for signs of dislocation, impaired circulation, or an open fracture, all of which would indicate a medical emergency requiring a doctor's immediate attention or a trip to a nearby emergency room. (*See* Ouellette Aff. ¶¶ 5–6, 8; Paulson Aff. ¶ 9.) Although Ouellette noted that Grant's right hand was swollen with a limited range of motion, there was no exposed bone, his hand was warm to the touch and had intact pulses, and he could straighten his fingers, albeit just barely. (*See* Ouellette Aff. ¶ 6 & Ex. B; Paulson Aff. ¶ 11 & Ex. D at 1.) Grant's vital signs were also normal and he was calm, alert, and talkative. (*See* Ouellette Aff. ¶¶ 6, 8 & Ex. B; Paulson Aff. ¶ 11 & Ex. D at 1.) Absent any apparent signs of dislocation, impaired blood flow, or an open fracture, Ouellette concluded that Grant was not suffering from an urgent medical need necessitating a trip to the emergency room. (*See* Ouellette Aff. ¶¶ 6, 8 & Ex. B; Paulson Aff. ¶ 11.)

In his complaint, Grant alleges that his hand was visibly deformed, immensely swollen, and in extreme pain, and that Ouellette exclaimed during her examination, "That's Broken, you should be seen at the Emergency Room." (Second Am. Compl. ¶¶ 7–9.) Her examination notes, however, do not include any findings of a fracture or deformity, just increased swelling with a somewhat limited range of motion. (Paulson Aff., Ex. D at 1.) Nurse Ouellette immobilized Grant's hand by wrapping it in an ACE bandage, provided him with ice and Ibuprofen, and advised him to keep his hand elevated. (*See* Ouellette Aff. ¶ 7 & Ex. B; Paulson Aff. ¶ 12 & Ex. D at 1.) Given Grant's complaints of severe pain, she also contacted the prison's on-call physician, Dr. Darryl

3

Quiram of Centurion, to whom she described Grant's symptoms. (*See* Ouellette Aff. ¶ 7 & Ex. B; Paulson Aff., Ex. D at 1; Defs.' Interrogs. ¶ 1.) Dr. Quiram prescribed Norco, a narcotic pain medication, and indicated that Grant should be seen in the prison clinic the next morning for further evaluation and possible x-rays. (*See* Ouellette Aff. ¶ 7 & Ex. B; Paulson Aff., Ex. D at 1 & Ex. F at 1; Defs.' Interrogs. ¶ 1.) Ouellette followed the doctor's instructions and advised Grant to contact health services before his scheduled clinic appointment if he experienced increased pain or other concerns. (*See* Ouellette Aff. ¶ 7 & Ex. B; Paulson Aff. ¶ 12 & Ex. D at 1.) There is no indication that Grant did so. (*See* Ouellette Aff. ¶ 7; Paulson Aff. ¶ 12.)

The next morning, Physician Assistant Gene Kliber examined Grant's hand and ordered x-rays, which revealed a fracture to the right fourth metacarpal. (*See* Paulson Aff. ¶ 13 & Ex. E at 1–2.) Kliber provided Grant with a splint, renewed his prescription for narcotic pain medication, and, suspecting that the fracture might require surgery, requested an orthopedic consultation, which Centurion promptly granted. (*Id.* ¶ 13, Ex. E at 1, Ex. F at 3.) Grant alleges that Kliber refused his request to be transported to an emergency room and outfitted him with an ill-fitting left-handed wrist brace, which caused "extreme discomfort and [a] rising level of pain" in his right hand. (Second Am. Compl. ¶¶ 11–12.)

Centurion staff scheduled Grant for an initial consultation with Twin Cities Orthopedics on July 17, 2014, based on the outside clinic's availability. (*See* Paulson Aff. ¶ 13 & Ex. D at 2; Defs.' Interrogs. ¶ 2; Doc. No. 20, Pl.'s Exs., Attach. 1 at 4.) In the meantime, Grant repeatedly removed his wrist brace and ACE bandage, complaining of

4

persistent pain in his right hand. (*See* Paulson Aff., Ex. D at 2; Second Am. Compl. ¶¶ 13–16.) Grant was instructed to wear the bandage and splint as directed, advised to keep his right hand above his heart to reduce swelling, and had his prescription for narcotic pain medication extended. (*See* Paulson Aff., Ex. D at 2.) He was later fitted with a right-handed splint on July 16, 2014. (*See* Second Am. Compl. ¶ 17; Paulson Aff., Ex. D at 2.)

Prison officials transported Grant to Twin Cities Orthopedics on July 17, 2014, for his scheduled consultation with Dr. Jay Johnson. (*See* Pl.'s Exs., Attach. 1 at 4; Defs.' Interrogs. ¶ 3.) Grant reported constant and progressively worsening pain in his right hand over the previous two weeks. (Pl.'s Exs., Attach. 1 at 4.) Dr. Johnson ordered x-rays, which confirmed a fracture to the right fourth metacarpal, and referred Grant to a hand specialist for surgery. (*Id.* at 5–6; Defs.' Interrogs. ¶ 3.) Grant underwent surgery four days later, on July 21, 2014. (Pl.'s Exs., Attach. 1 at 7–8; Paulson Aff. ¶ 13.) Pins were surgically inserted into his right hand and he was fitted with a cast. (Pl.'s Exs., Attach. 1 at 8–9; Defs.' Interrogs. ¶ 5.) At a follow-up orthopedic appointment on September 2, 2014, Grant reported a significant decrease in pain. (Pl.'s Exs., Attach. 1 at 9; Defs.' Interrogs. ¶ 5.) His cast and pins were removed, x-rays showed "interval healing with callus formation and normal alignment," and he was fitted with splints "to protect [his] finger from radioulnar deviation with flexion and extension." (Pl.'s Exs., Attach. 1 at 10.) Grant was advised to avoid "firm gripping, weight-bearing, or pushing/pulling/ lifting more than 5 pounds with [his] right hand," and to "follow up in 4 weeks for new x-rays and to advance [these] restrictions." (*Id.*)

Rather than transporting Grant back to Twin Cities Orthopedics at the four-week mark, his hand was x-rayed and evaluated by a physical therapist at MCF-Faribault on October 2, 2014. (*See* Paulson Aff., Ex. E at 2; Defs.' Interrogs. ¶ 9; Pl.'s Exs., Attach. 1 at 11; Second Am. Compl. ¶ 23.) Because the x-rays showed no change in healing, the physical therapist referred Grant to P.A. Kliber to obtain authorization for another outside consultation. (*See* Paulson Aff., Ex. E at 2; Second Am. Compl. ¶ 24.) Kliber saw Grant on October 14, 2014, noting that there "appear[ed] to be non-union at this time" and that he would therefore "request Orthopedics to revisit [the] fracture." (Paulson Aff., Ex. E at 2.) It is unclear from the record whether Kliber ever made that request. Kliber ordered additional x-rays on November 4, 2014, which, according to his notes, showed a visible fracture line that "appear[ed] to be healing" with "a good periosteal response starting." (*See* Paulson Aff., Ex. E at 2.) Given those results, Kliber believed that the fracture "should repair itself" within four to six weeks. (*Id.*) Grant was advised to continue wearing his splint and that prison medical staff would monitor his progress. (*Id.*)

Over the next month, Grant was repeatedly seen by Dr. Fred Roberson. (*See* Paulson Aff., Ex. E at 3–4.) Dr. Roberson initially concurred with Kliber's assessment, noting that Grant's x-rays were "beginning to show periosteal reaction . . . and bridging across the fracture" and concluding that Grant "should be fine in the very near future" without any "need for him to return to Orthopedics." (*Id.* at 3.) When Grant complained of increased pain, however, Dr. Roberson ordered further x-rays in early December 2014, which showed "some minimal periosteal bridging across the gap" but little "in the way of union." (*Id.* at 3–4.) Dr. Roberson requested an outside consultation, which took place at

6

Twin Cities Orthopedics on December 9, 2014. (*See id.* at 3–4; Pl.'s Exs., Attach. 1 at 11.) At that time, x-rays showed "a fracture line that [was] still visible but [with] boney callus[es]" and Grant's right hand was re-casted to facilitate further healing. (*See* Pl.'s Exs., Attach. 1 at 12; Defs.' Interrogs. ¶ 10.)

Grant was released from state custody less than a month later, on December 29, 2014. (*See* Doc. No. 34, Aff. of Patrick Courtney ¶ 9 & Ex. A.) As of January 21, 2015, Grant's orthopedic doctor noted that his fourth metacarpal fracture had "solidly healed." (Pl.'s Exs., Attach. 1 at 13.)

## II. DISCUSSION

Grant claims that Nurse Ouellette and Dr. Quiram violated his Eighth Amendment rights when, on July 2, 2014, they failed to send him to a local emergency room for immediate treatment of his hand injury. (Second Am. Compl. ¶¶ 2, 4, 33, 35.) He claims that P.A. Kliber likewise violated the Eighth Amendment when he failed to refer him to an emergency room on July 3, 2014, lowered his pain medication on some unidentified date, and failed to schedule a follow-up appointment with Twin Cities Orthopedics four weeks after his surgical pins were removed on September 2, 2014. (*Id.* ¶¶ 3, 34.) And he seeks to hold Centurion liable for these allegedly unconstitutional acts because it employs Dr. Quiram and P.A. Kliber. (*Id.* ¶ 36.)

Nurse Ouellette and the Centurion Defendants have moved for summary judgment on Grant's Eighth Amendment claims, arguing that his fracture did not qualify as a serious medical need and that he was otherwise provided with reasonable and appropriate care. (*See* Doc. No. 33 at 1–2, 6–9; Doc. No. 40 at 1–2, 5–6.) They heavily rely on an

affidavit from Dr. David Paulson, the Minnesota Department of Corrections' Medical Director, who asserts that Grant's hand injury did not warrant an emergency room visit given the absence of signs of impaired blood flow or an open fracture, that the treatment provided by prison staff was "entirely appropriate," and that Grant would have received the same care at an emergency room that he did at MCF-Faribault — namely, immobilization of his hand, ice and pain medication, x-rays, and instructions to elevate his hand and refrain from using it. (Paulson Aff. ¶¶ 9–14.) Dr. Paulson notes that, due to swelling, patients with hand injuries typically must wait several days before further treatment can be administered, including surgical intervention and casting. (*Id.* ¶ 10.) He concludes that "there is no indication that Grant suffered any medical harm by receiving treatment at the prison instead of at a hospital emergency room." (*Id.* ¶ 14.)

**A. Standard of Review**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Thomas v. Heartland Emp't Servs., LLC*, 797 F.3d 527, 529 (8th Cir. 2015). The movant bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011). If it does so, the nonmoving party may not rest on mere allegations or denials, but instead "must present affirmative evidence" of "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see*

8

*also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials . . . ."). Where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is warranted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

**B.  The Evidence Does Not Support an Eighth Amendment Violation**

The Eighth Amendment's ban on cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation omitted). A plaintiff seeking to establish such wantonness in the provision of medical care must show both that he was suffering from "an objectively serious medical need" and that the defendants "actually knew of but deliberately disregarded" that need. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (quotation omitted). This deliberate-indifference standard requires a mental state "akin to criminal recklessness," demanding that prison officials consciously disregard a known and substantial risk of serious harm through actions that are "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Id.* at 1065–66 (quotation omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A plaintiff "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quotation omitted). A

9

failure to receive a preferred course of treatment or evidence that merely implicates a medical professional's judgment do not raise a constitutional issue, as the Eighth Amendment neither prohibits medical personnel from "exercising their independent medical judgment" nor guarantees "any particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). Instead, the Eighth Amendment requires only that prison officials reasonably respond to a known risk of harm, "even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 (quotation omitted).

Contrary to the defendants' contentions, the evidence is sufficient to show that Grant was suffering from an objectively serious medical need. A serious medical need is "one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jones v. Minn. Dep't of Corrs.*, 512 F.3d 478, 481 (8th Cir. 2008). Grant's hand injury, which was diagnosed by medical personnel as a fracture requiring narcotic pain medication, surgery, and casting, satisfies that standard. *See Wise v. Lappin*, 674 F.3d 939, 941 (8th Cir. 2012) ("Wise's painful broken jaw constituted an objectively serious medical need."); *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (considering a fractured finger to be a serious medical need); *Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998) ("There is no doubt that the plaintiff had a serious medical need. His hand had been broken.").

Nevertheless, this Court finds that the evidence does not support the conclusion that Nurse Ouellette, Dr. Quiram, or P.A. Kliber deliberately disregarded Grant's medical needs through actions that were "so inappropriate as to evidence intentional maltreatment

or a refusal to provide essential care." *See Jackson*, 756 F.3d at 1066 (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240–41 (8th Cir. 1997)). The record shows that Nurse Ouellette promptly examined Grant's hand and found no need for emergency care given his stable vital signs, calm and alert demeanor, and the absence of any obvious signs of impaired circulation, dislocation, or an open fracture. She consulted with Dr. Quiram, who agreed with her assessment, prescribed narcotic pain medication, and indicated that Grant should be seen the next morning for further evaluation and possible x-rays. Nurse Ouellette complied with the doctor's instructions and treated Grant's injury with ice, pain medication, and an ACE bandage until he could be seen at the prison clinic. That next morning, P.A. Kliber examined Grant's injury and ordered x-rays, which showed a fracture to the right fourth metacarpal. Kliber immediately requested an outside orthopedic consultation and, in the meantime, provided Grant with a splint and renewed his prescription pain medication. Based on provider availability, Grant was scheduled for an orthopedic consultation two weeks later, on July 17, 2014, and underwent hand surgery four days after that. From that point forward, Grant's hand was repeatedly examined and x-rayed by prison medical staff, including Kliber and Dr. Roberson, until it became apparent that his fracture was not healing properly and had to be re-casted.

According to Dr. Paulson's expert testimony, the treatment that Grant received, including the initial decision to tend to his hand injury on-site, was entirely appropriate and consistent with the standard of care for a hand injury. As Dr. Paulson notes, due to swelling, Grant's injury could not immediately be treated with casting or surgical intervention and, thus, he would have received the same treatment at an emergency room

11

that he received at MCF-Faribault in the days following the injury. Grant disputes that assessment, arguing that he should have immediately been sent to an emergency room for his broken hand given his severe pain, "visible physical deformity," and "immense swelling." (*See* Second Am. Compl. ¶¶ 3–4; Pl.'s Mem. at 1.) He alleges that Nurse Ouellette, upon first examining his hand, exclaimed, "That's Broken, you should be seen at the Emergency Room," and contends that an average citizen "would more likely than not get to an emergency room" after breaking a bone. (Second Am. Compl. ¶ 8; Doc. No. 54, Pl.'s Mem. 2.)

Even assuming that Grant's version of his initial interaction with Nurse Ouellette is true,[2] there is no dispute that Ouellette consulted with the on-call physician, Dr.

---

2    The Court will assume the truth of Grant's allegations regarding his interaction with Nurse Ouellette because those allegations still do not show that she acted with deliberate indifference to his medical needs. The Court notes, however, that Grant has not presented or otherwise cited any actual evidence to substantiate his allegations, including a personal affidavit or declaration subscribed as true under penalty of perjury. A plaintiff, even a pro se one, cannot withstand summary judgment by relying on unsworn allegations, but "must set forth by affidavit or other evidence specific facts" showing a genuine issue for trial. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1991) (quotation omitted); *see also Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 421 (8th Cir. 2011) ("[A]llegations alone are insufficient to survive a summary judgment motion . . . ."). The evidence that is in the record does not support Grant's unsworn allegations that it was immediately apparent to Nurse Ouellette that his hand was broken, marked by "visible physical deformity" and "immense swelling," and necessitated a trip to the emergency room. Ouellette's sworn affidavit and reports from the time of the injury note that there was some swelling to Grant's hand, but that there were no obvious signs of dislocation, open fracture, or impaired circulation requiring a trip to the emergency room. (*See* Ouellette Aff. ¶ 6; Paulson Aff., Ex. D at 1.)

Grant has also not offered any competent medical evidence to rebut the professional opinions of Dr. Paulson, Dr. Quiram, and Nurse Ouellette that an emergency room visit was not necessary and that the treatment he received at MCF-Faribault was
(Footnote Continued on Next Page)

Quiram, about Grant's symptoms, treatment, and course of care. Dr. Quiram concluded that Grant should be seen in the prison clinic the next morning for further evaluation and possible x-rays. Ouellette followed the doctor's instructions, immobilized and iced Grant's hand, and provided him with Ibuprofen and narcotic pain medication. She also scheduled a clinic appointment for Grant and advised him to contact health services if he experienced increased pain or other concerns in the interim. Grant's hand was examined and x-rayed the next morning, which revealed a fracture. Prison staff treated the fracture by providing Grant with a splint and refilling his prescription for narcotic pain medication. They also requested an orthopedic consultation, which was granted and scheduled for July 17, 2014.

Although Grant certainly would have preferred to go to the emergency room, the Eighth Amendment's ban on cruel and unusual punishment neither guarantees inmates "medical care commensurate with that enjoyed by civilian populations," *Hines v. Anderson*, 547 F.3d 915, 922 (8th Cir. 2008), nor their preferred course of treatment,

---

(Footnote Continued from Previous Page)
appropriate. For example, he has not presented testimony from a qualified medical professional that the treatment he received "so deviate[d] from the applicable standard of care as to evidence . . . deliberate indifference." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001) (explaining that expert opinion is usually required to establish that a course of medical treatment "so deviate[d] from the applicable standard of care as to evidence a physician's deliberate indifference"); *see also Meuir v. Greene Cty. Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007) (holding that the defendants were entitled to summary judgment where the plaintiff "produced neither expert testimony nor documentary evidence to support his claim that the treatment provided by the Jail's medical staff was constitutionally inadequate"). Grant's disagreement with the treatment decisions made by the defendants cannot, by itself, support an Eighth Amendment claim. *See Langford*, 614 F.3d at 460.

*Long*, 86 F.3d at 766. So long as prison officials "acted reasonably," the "existence of a possible alternate course of treatment, which may or may not have been successful, is not sufficient to raise an inference of deliberate indifference." *Dulany*, 132 F.3d at 1241 (quotation marks omitted). While Nurse Ouellette, Dr. Quiram, and P.A. Kliber could have sent Grant to an outside emergency room, their professional decisions to treat him on-site were not so unreasonable as to amount to deliberate indifference to his medical needs. *See Letterman v. Does*, 789 F.3d 856, 865 (8th Cir. 2015) ("While Jennings could have acted differently in the situation and while her actions may be considered negligent under the circumstances, her conduct does not constitute deliberate indifference."); *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997) ("We think the efforts the prison doctors took to allay Logan's pain, while perhaps not as extensive as those a private health-care provider might have taken, did not reflect deliberate indifference to his medical needs."). Where, as here, medical records indicate that "treatment was provided and physician affidavits indicat[e] that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." *Dulany*, 132 F.3d at 1240.

That leaves Grant's additional claims that P.A. Kliber violated his Eighth Amendment rights by lowering his pain medication and failing to schedule a timely follow-up visit with his outside orthopedic specialist.[3] (*See* Second Am. Compl. ¶¶ 3, 34.)

---

[3] In the background portion of his second amended complaint, Grant also alleges that Kliber fitted his broken right hand with a left-handed wrist brace, which caused him "extreme discomfort and [a] rising level of pain." (Second Am. Compl. ¶ 12.) When

(Footnote Continued on Next Page)

Grant, however, has not identified when Kliber allegedly lowered his pain medication, cited any evidence in support of that allegation, or otherwise demonstrated that any such decision was so inappropriate and so deviated from the appropriate standard of care as to constitute deliberate indifference. *See* Fed. R. Civ. P. 56(c) (providing that a party asserting a fact must cite "particular parts of materials in the record" and that courts "need consider only the cited materials"); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in [the] record . . . ."). In addition, it is not apparent from the medical evidence in the record whether Kliber ever lowered Grant's pain medication, let alone when, under what circumstances, and by how much.

---

(Footnote Continued from Previous Page)
Grant complained about the brace, Kliber allegedly responded that he only had to access to a left-handed splint. (*Id.*) Neither Grant's complaint nor memorandum in opposition to summary judgment, however, claims that the use of a left-handed wrist brace violated his Eighth Amendment right to be free from cruel and unusual punishment. (*See generally id.*; Pl.'s Mem.) Grant does not even mention the matter in the portion of his complaint outlining his Eighth Amendment claims. (*See* Second Am. Compl. ¶¶ 32–36.) While courts have a duty to liberally construe pro se pleadings, this Court does not believe that that principle requires interpreting a complaint to include claims that have not been presented. *See Muhammad v. Bethel-Muhammad*, 574 F. App'x 922, 923 (11th Cir. 2014) (explaining that liberal construction of pro se pleadings "does not give a court license to serve as *de facto* counsel for a party" or to "rewrite" a pleading); *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999) ("[A] district court should not assume the role of advocate for the pro se litigant and may not rewrite a petition to include claims that were never presented.") (quotations and citations omitted); *Daury v. Smith*, 842 F.2d 9, 15 (1st Cir. 1988) ("We will not rewrite plaintiff's complaint to contain a count that was not included in it."). Moreover, even if Grant had adequately raised such a claim, the record does not show that Kliber's use of a left-handed wrist brace rose to the level of an Eighth Amendment violation. *See Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498 (8th Cir. 2008) (explaining that neither medical malpractice, negligence, nor even gross negligence rise to the level of an Eighth Amendment violation).

15

As for Grant's remaining allegation, the record shows that Twin Cities Orthopedics, after removing his surgical pins on September 2, 2014, recommended a "follow up in 4 weeks for new x-rays and to advance restrictions" on his physical activities. (Pl.'s Exs., Attach. 1 at 10.) Rather than referring Grant back to Twin Cities Orthopedics for the recommended follow-up evaluation, prison medical staff chose to monitor his condition at MCF-Faribault, which included taking additional x-rays on October 2, 2014, November 4, 2014, and December 2, 2014, before transporting him to the outside orthopedic clinic on December 9, 2014, for re-casting. (*See* Paulson Aff., Ex. E at 2–4; Pl.'s Exs., Attach. 1 at 11.) According to the defendants' interrogatory answers, follow-up x-rays and evaluations are typically "handled internally when the patient is in a correctional setting" due to "the security concerns associated with offsite visits." (Defs.' Interrogs. ¶ 9.)

Grant has not submitted sufficient evidence to show that the decision to perform the recommended follow-up evaluation at the prison, rather than at the outside orthopedic facility, adversely affected his prognosis and was so grossly inappropriate as to constitute deliberate indifference. *See Dulany*, 132 F.3d at 1240 (holding that prison officials' failure "to follow the recommendations of [the plaintiff's] outside consultants" did not amount to deliberate indifference, where the plaintiff failed to show "harm from any delay in treatment" and "medical records indicate[d] that prison physicians [] actively attended to her needs"). Grant was not constitutionally entitled to "any particular course of treatment," *id.*, and the decision to conduct his follow-up examinations on-site was at

most negligent, which cannot support an Eighth Amendment claim. *See Popoalii*, 512 F.3d at 499 (8th Cir. 2008).

As the Supreme Court has emphasized, "[t]o be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety . . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." *Whitley*, 475 U.S. at 319. The evidence, even when viewed in Grant's favor, does not support the conclusion that any of the defendants acted with the wantonness proscribed by the Eighth Amendment's ban on cruel and unusual punishment.[4] This Court therefore recommends that the defendants' motions for summary judgment be granted.

---

[4] Because the evidence does not support an inference that Nurse Ouellette, Dr. Quiram, or P.A. Kliber acted with deliberate indifference to Grant's medical needs, this Court has not separately addressed Grant's claim that Centurion should be held accountable for the actions of the individual defendants. This Court notes, however, that Centurion cannot be held liable under § 1983 simply because it employed Dr. Quiram and P.A. Kliber, but only if the alleged constitutional violations stemmed from an official company policy or custom. *See Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 976 (8th Cir. 1993). Apart from Grant's failure to demonstrate an underlying Eighth Amendment violation, he has not identified any Centurion policy or custom that caused the alleged violations; he simply seeks to hold the company liable under § 1983 because it employs two of the individual defendants, which he cannot do. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978) (explaining that § 1983 does not "impose liability vicariously . . . solely on the basis of the existence of an employer-employee relationship with a tortfeasor").

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Robin Ouellette's motion for summary judgment (Doc. No. 32) be **GRANTED**;

2. Defendants Centurion of Minnesota, Darryl Quiram, and Gene Kliber's motion for summary judgment (Doc. No. 39) be **GRANTED**; and

3. This action be **DISMISSED WITH PREJUDICE**.

Date: June 23, 2016

*s/ Becky R. Thorson*_____
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report by **July 11, 2016**. A party may respond to these objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).